**ENGLISH CONST. CO., Inc., v. UNITED STATES.**
**No. 7.**

District Court, D. of Delaware.
Sept. 15, 1939.

Ward & Gray, of Wilmington, Del., and Harry Kalman, of New York City, for plaintiff.

John J. Morris, Jr., U. S. Atty., of Wilmington, Del., and Tom De Wolfe, Sp. Asst. to Atty. Gen. (J. H. Reddy, W. B. Cowles, and M. W. Hibschman, Attys., Department of Justice, all of Washington, D. C., on the brief), for the United States.

NIELDS, District Judge.

September 25, 1928, a contract was made between the English Construction Company, Inc., plaintiff, and United States of America, defendant, known as contract "NOy-416" (Specification No. 5635) for repairs to boiler house at the Naval Academy (Engineering Experimental Station), Annapolis, Maryland. Plaintiff agreed to make repairs and defendant agreed to pay therefor $18,497.

Plaintiff's vice president and the manager of its Washington office was Dennis E. Conners. He was present during the performance of the contract. He testified that he was "a bricklayer by trade and I worked up to general contractor and superintendent", and that he or his company, plaintiff, had been in the construction business about fifty years; that he had been engaged in the erection of post offices, court houses, public schools and armories at various places throughout the United States. During the protracted performance of the work there were numerous occasions of irritation which provoked charges and countercharges. It would be unprofitable to dwell upon these disputes. Suffice it to say, the controversy in this case does not relate to the quality of the completed work but only to claims of plaintiff for extra work and labor. The boiler house at the Naval Academy known as the Engineering Experimental Station had been partially destroyed by an explosion. The contract in suit covered the repairs required to restore this boiler house. The issue in the case mainly concerns additional work and materials or extras furnished by plaintiff. The principal question is whether the allowances made for such extras were sufficient and whether the time allowed was adequate.

The claims set forth in plaintiff's complaint fall into four groups:

First. A group of three claims abandoned by plaintiff.

Second. A group of three claims where no government change-order was given

and no decision by the "Board" was made. The determination of the merit of these claims involves only questions of law.

Third. A group of three claims where change-orders were given and where the allowance made by defendant for the changes, both as to the amount of money and the time allowed, are alleged to be insufficient.

Fourth. A claim for recovery of the amount alleged to have been illegally deducted as liquidated damages for delay in the completion of the contract.

These groups will be considered in their order.

First. In the seventh paragraph of the complaint plaintiff sets forth a bill of particulars of the extra and additional work performed and the reasonable value thereof. During the trial certain claims of plaintiff were abandoned. Item (b) is extra building of additional water table $30.25. Item (c) is extra labor and materials for additional roofing $127.05. Claims based on these items were abandoned by plaintiff. In paragraphs nine and ten of the complaint plaintiff claims damages in the amount of $1,000 on account of hindrance, obstruction, interference and delay on the part of the defendant. This claim was also abandoned.

Group second includes items (a), (f) and (h) of the bill of particulars.

(a) Extra painting of steel deck $1,026.08
(f) Unauthorized deduction for removal of airtight compartment and superheater....... 135.50
(h) Extra cost of additional lathing and plastering.......... 1,983.50

Respecting the above items it may be said generally, (a) depends upon the correct interpretation of the contract; (f) is purely a question of law; and (h) depends upon the interpretation of a blueprint or a drawing which is part of the contract. With respect to these items no ruling of defendant could be final. Decision rests with the court.

(a) The first item in the bill of particulars is "(a) Extra Painting of steel deck $1,026.08". This claim hinges upon the interpretation of the specifications of the contract.

"Section 6. Roofing and Sheet Metal Work". 6–02 (a) provides: "Sheet steel * * * shall be * * * black, painted, or galvanized * * *. Black steel

shall be given a shop priming coat of red lead paint".

"Section 9, Painting. 9–01 General requirements. The work includes cleaning and painting all new and existing structural steel work and steel windows and the under sides of steel roof decks if black steel sheets, red lead primed, are used."

"9–03. Painting. * * * All work shall be painted two coats (in addition to the shop or priming coat) of white lead zinc oxide paint colored as directed."

Such being the pertinent provisions of the specifications, the following letters were exchanged between the parties.

December 8, 1928, plaintiff wrote defendant: "Referring to contract on boiler house at Annapolis, the specification calls that shop priming coat of red lead paint be given the steel roof decking. The usual method is to give this roof decking a baked on shop coat of red oxide paint, and we request that the same be accepted in lieu of *priming* coat as called for, as a baked on job, as you know will make a better job".

December 12, 1928, defendant wrote plaintiff: "The Bureau approves the use of red iron oxide paint, baked on, for use as priming coat of paint on the steel roof deck being furnished by Ironclad Inc., for the work under the subject contract. It is understood that this paint and its application conform to the standard manufacturing practice for this class of work. The steel sheets will be subject to inspection before and after painting."

February 25, 1929, defendant wrote plaintiff: "Two coats of field paint on the underside of the steel roof deck are required by the contract."

It should be particularly noted that plaintiff requested the substitution of one priming coat for another according to plaintiff's interpretation of Section 9 of the specifications. "It is therefore obvious", says plaintiff, "that the only case where painting of the under side of the steel deck is required under the contract was the case where black steel sheets, red lead painted, were used". On the contrary, it is obvious that when the Bureau of Yards and Docks authorized "the use of red iron oxide paint, baked on, for use as a priming coat of paint on the steel roof deck" it merely authorized plaintiff to substitute a baked on oxide coat as the prim-

ing coat. The contract prescribes two coats of field paint.

Item (a) of the bill of particulars for painting the steel deck is covered by the contract and is not an extra.

■ "(f) Unauthorized deduction for removal of airtight compartment and super-heater $135.50".

The specifications provide:

"Section 1. General Clauses.

"1–02. General description.—The work includes removing certain damaged work; * * * and dismantling west air-tight border compartment."

"Section 2. Removal of existing work.

"2–01. General requirements.— * * The contractor shall dismantle the roof and north and west walls of the west airtight boiler compartment; the door frame in the former front wall of the compartment; and the stack, blower, and super-heater in the compartment."

"Section 10. Bids.

"10–02. Item 1—Price for the entire work, complete in accordance with the drawings and specifications".

It may be assumed as true that at the time plaintiff inspected the site, at the time it prepared and submitted its bid and at the time the contract was executed, the west air-tight compartment and super-heater had been removed by defendant. The specifications, quoted above, expressly specified the removal of the compartment and super-heater. The bid of plaintiff was bound to cover this removal unless excepted from the bid. Moreover, plaintiff failed to make objection to said items in the specifications. It was obvious to plaintiff, it could not remove what defendant had already removed. Plaintiff failed to call the error in the specifications to the attention of defendant in connection with its bid as required by Section 4 of the general provisions of the contract providing:

"4. Correction of errors.—Bidders are expected to read the drawings and specifications with special care, and to observe all their requirements. Discrepancies, ambiguities, errors, or omissions noted by intending bidders, should be promptly reported to the Chief of the Bureau of Yards and Docks for correction or interpretation before the date of the opening of bids".

The court finds plaintiff's bid covered the above removal and that a deduction was lawful. The contracting officer decided

the amount to be credited defendant for such removal was $135.50. The same stands.

■ "(h) Extra cost of additional lathing and plastering $1,983.50."

No written change-order was given with respect to this item. Section 7 of the specifications require:

"Lathing and Plastering". 7–05 provides: "Plastering.—Plaster shall be finished not less than 2 inches thick, except where indicated otherwise. It shall be applied in 3 coats, 2 coats on the ribbed side of the lath and back plastered one coat. The first coat shall be applied with pressure so as to form a good key and shall be cross scratched for bonding the second coat. All surfaces shall be true, plumb, and out of wind. All exposed finished coats shall be rubbed with wood floats to form a sandy surface without glaze. Plaster shall be joined to existing work in a neat manner."

The specifications do not indicate where the plastering was to be done. In order to ascertain the areas to be plastered reference must be made to a contract drawing prepared by defendant. An examination of the drawing discloses three instances where plaintiff was instructed to remove the old plaster and replace with new plaster. Under sketch "B" on the left-hand side of the drawing, appears the notation: "Remove 18 sq. yds. of old plaster and replace with 18 sq. yds, of new plaster."

Immediately below and to the right of sketch "B", appears the notation: "Remove old plaster and replace with 32 sq. yds. 2" thick new plaster."

To the extreme right of the drawing, over "View K-K", appears the notation: "2" plaster wall to be removed and replastered. 53 sq. yds."

Plaintiff did this work, was paid therefor, and no claim is made for any extra incident thereto. Plaintiff claims that these three areas are the only locations indicated on the drawing where plastering was to be done.

However, the drawing shows other places indicated by dots, some of which are labeled "Plaster". There are still other instances where only dots appear with no label. These places indicate locations where plaster exists but give no suggestion as to removal or replacement.

The purpose of the drawing is not only to give instructions respecting new work but also to give information respecting existing conditions. For example, in the lower left-hand corner there is a sketch and notation: "View showing present construction of Ferro—inclave roof." This is purely information.

A witness for defendant stated all dotted areas indicated plaster and meant that plastering was to be done. But "View P–P" at the lower right of the drawing and the concrete base, under section "H—H" at the upper left hand corner of the drawing, were peppered with dots and this witness admitted they were not to be plastered.

There is here no ambiguity. In three instances clear and express instructions respecting plastering were given and were followed. Plaintiff had the right to assume that when such instructions were absent no plastering was intended.

Plaintiff's interpretation of defendant's blueprint is fully stated in its contemporary letter of January 22, 1929, to the Bureau of Yards and Docks: "On drawing [meaning the blueprint] you have notes that show the removing of three lots of plaster and the replacing of same, namely 18 square yards, 32 square yards and 53 square yards, and the notes being on each lot, it would seem that it was done for a specific purpose to show just the amounts that were intended to be removed and replaced and it would govern same".

This 103 square yards of plaster the plaintiff removed and replastered. For this plaintiff has been paid in full. The extra plastering, being item (h) in the bill of particulars, is the matter in dispute. The above letter continues: "Your itemization has other surfaces, namely 34 square yards, 32 square yards, 103.5 square yards and 10 square yards, with no indication of removing or replacing, therefore we contend that we are not obligated to remove or replace these surfaces".

Plaintiff's proof is that the actual cost of this work based on the fair and reasonable market value of the labor and materials involved including overhead and profit was $2,597.26.

January 16, 1930, plaintiff wrote the Bureau of Yards and Docks:

"As a matter of fact 238.5 square yards of lathing and plastering in addition to that required by the contract was performed, and also in addition to that lathing and plastering claimed under other items of

additional work herein. Below is a summary of the actual cost of this additional lathing and plastering:

Lathing and Plastering 238.5
  square yards at $9 ........... $2,146.50
    Overhead ................  214.65
                              ----------
                              $2,361.15
  Profit ..................   236.11
                              ----------
                              $2,597.26"

In connection with change-order C the Board made an allowance of $613.76 for additional plastering. Credit is given the defendant for that amount. Thus there is due plaintiff $1,983.50.

■ The third group of three claims, where change-orders were given, include items of extra cost for:

(d) Substituting wire mesh ...... $895.04
(e) Additional gutters, down
    spouts baskets and splash
    plates .....................  206.48
(g) Repairs to concrete beams and
    work incidental thereto .......  420.09

"(d) Extra cost of substituting woven wire mesh in lieu of metal lath in excess of the amount allowed $895.04".

Defendant ordered this substitution. The officer in charge by written change-order dated October 11, 1928, and the Chief of the Bureau of Yards and Docks by written order dated January 12, 1929, confirming said change, directed that plaintiff "(a) In lieu of the metal lath specified in paragraph 7–03 of the specification, provide and install a woven wire fabric, square meshed, 2½ meshes per lineal inch, woven with wires not less than .047 inches in diameter and galvanized after weaving." The sufficiency of the allowance is the sole question. Defendant allowed $101.70 for the wire mesh and deducted $71.70 for the lath, making the net allowance $30. Plaintiff claims this allowance was insufficient.

Plaintiff's proof is that the difference in cost of material between wire mesh and metal lath is slight but it required 3 times more labor to install wire mesh and the labor of plastering wire mesh was greater. Plaintiff testified the cost of the additional labor and additional material, including profit and overhead, was $925.04. Defendant having allowed $30, the balance claimed by plaintiff is $895.04. With apparent force plaintiff argues that the defendant made an allowance only for a difference in cost of material. However, the fact remains that the Board made a finding that the extra cost of substituting wire mesh was $30. This finding is final. The amount of $30 having been paid to plaintiff item (d) will be disallowed except the amount of $103.46, overhead and profit, which defendant admits to be due plaintiff, defendant having omitted this item in its calculations.

The Board having made findings as to (e) additional gutters, and (g) repairs to concrete beams, such findings are also final and these items are disallowed.

■ Fourth. The contract provided: "The work shall be commenced within 10 calendar days after date of receipt of notice to proceed and shall be completed within 180 calendar days from the date of receipt of notice to proceed".

According to defendant's proof, notice to proceed with the work was given to plaintiff on October 27, 1928. An extension of 14 calendar days was duly authorized making the date for completion of the work May 9, 1929. In fact the work was completed June 14, 1929. Plaintiff computes the period of delay at 36 calendar days. The Bureau of Yards and Docks made the following findings of fact: "Notice to proceed having been served October 27, 1928, and the time prescribed for performance being 180 calendar days, the date for the completion of the work became April 25, 1929. For authorized changes, the time for performance has been extended, by Change B two days and by Change C twelve days, a total of fourteen calendar days, deferring the date for completion to May 9, 1929. The work was completed June 14, 1929, the period of delay being thirty-six calendar days. The Bureau does not find that this delay or any part thereof was owing to acts of the Government or to other causes enumerated as excusable under Article 9 of the contract. The preparation of the final voucher with a deduction of $720 as liquidated damages, together with release of claims, is authorized. The contractor has the right under Article 16(d) of the contract to except from its release such claims it may see fit."

Liquidated damages of $720 for delay in completion of the work was deducted by defendant from the amount due plaintiff. Plaintiff seeks to recover this sum as an illegal deduction. The finding of the con-

tracting officer of defendant respecting the responsibility for delay is final. The record discloses no proof of fraud or bad faith.

However, there is apparent fairness in plaintiff's contention that it received notice to commence work on October 31, 1928, and not on October 27, 1928. The correctness of the later date is borne out by plaintiff's letter to defendant of November 3, 1928: "We are in receipt of notice to proceed on contract on Repairs to Boilers, Annapolis, Md. from J. H. Newton. We received this notice Oct. 31. We take it that the time of our contract starts from date of receipt of this notice."

This is express notice to defendant, contemporary with the event, concerning a vital element of the contract. If it was erroneous, it was incumbent upon defendant to correct it. In the absence of any correction by defendant, the court finds plaintiff's statement that it received notice to commence work on October 31, 1928, to be true. As a result the liquidated damages of $720 should be reduced $80, making the damages for delay in completing work $640.

The law is well settled that the provisions of a contract giving the officer in charge or the board authority to determine disputes and make final decisions thereon are valid and binding.

"* * * From the nature of the case, an impartial, competent referee, invested with conclusive discretion, was required. The appropriation was to be expended under the direction of the secretary of war. This particular work was in charge of a captain of engineers in the United States army. No referee more accessible, competent, or impartial could be suggested than such officer should have been. In the absence of fraud, or such gross error or mistake as would imply bad faith, his decisions must be upheld as conclusive on the appellants. The proof does not show fraud or such gross mistake in the action of this referee. That a court acting on the testimony in the record might have decided differently from the referee in the matter of the appellants' claim does not warrant the setting aside the decision of the engineer in charge of the work. The circuit court so held, and its judgment is affirmed. Kihlberg v. U. S., 97 U.S. 398 [24 L.Ed. 1106]; Sweeney v. U. S., 109 U.S. 618, 3 S.Ct. 344 [27 L.Ed. 1053]; Railroad Co. v. March, 114 U.S. 549, 5 S.Ct. 1035 [29 L. Ed. 255]; Railroad Co. v. Price, 138 U.S. 185, 11 S.Ct. 290 [34 L.Ed. 917]." Ogden v. United States, 5 Cir., 60 F. 725, 726.

The plaintiff is entitled to judgment against the defendant in accordance with the foregoing findings.

Exceptions may be filed within ten days.